1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOHN P. LANNING,

11              Petitioner,                    No. CIV S-06-2895 EFB P

12        vs.

13   RICK HILL[1], Warden,

14              Respondent.                    <u>ORDER</u>

15   _____/

16        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his conviction of assault with a

18   deadly weapon, claiming that:  (1)  the trial court erroneously instructed the jury with certain

19   instructions regarding self-defense and trespassing; and (2)  the trial court erroneously failed to

20   clarify the instructions when presented with jury questions.  This matter is before the

21   undersigned pursuant to consent of the parties.  *See* 28 U.S.C. § 636; Fed. R. Civ. P. 73.

22   ////

23   ////

24

25        [1] The Court hereby substitutes Rick Hill, Warden of the facility where petitioner is
currently located, as the respondent.  *See* Rule 2(a), Rules Governing § 2254 Proceedings; Fed.
26   R. Civ. P. 25(d).

1

Upon careful consideration of the record and the applicable law, petitioner's application for habeas corpus relief is denied.

## I.    Background

On May 6, 2005, petitioner was convicted of assault with a deadly weapon (California Penal Code § 245(a)(1)) following a jury trial in Siskiyou County Superior Court.  Resp.'s Lodg. Docs., Lodg. Doc. 1 at 224, 230.  The facts of the offense, as stated by the California Court of Appeal[2], are:

[*Prosecution Case*]

In May 2004, Melissa Renfro, who was pregnant with [petitioner]'s child, traveled with petitioner from Oregon to Yreka.  They stayed at the residence of Renfro's grandmother, Margie Willett.  Willett's adult son, Henry Matlock, lived with her.  During the summer, he slept in the garage because of the heat.

After residing in the Willett house for three weeks, Renfro and defendant moved into a room at the Ben-Ber Hotel. [footnote omitted]  There, they befriended Claude Freedle and his girlfriend Melinda Nakamura, who worked at the Ben-Ber.

Renfro gave birth on July 1; the next day she and defendant left the hospital and returned to the Ben-Ber.  That evening, defendant and Freedle decided to go to a bar at the Montague Hotel.  They spent approximately five hours there, drinking and playing pool. They left when Nakamura called Freedle and told him to come home.

On the way home, defendant told Freedle he needed to stop at the Willett house to borrow $20 from his uncle.  Defendant parked in the driveway and entered the side door of the garage where Matlock slept.  A short time later, Freedle heard a male voice yelling "get the fuck out of the driveway," and "get that fucking guy out of my yard."  Defendant left the garage and went to the house of neighbor Jay Scholz, where Scholz and Rodney Culver were playing pool.  Defendant attempted unsuccessfully to borrow money from Scholz.  He then returned to Matlock's garage.  A short time later, Freedle heard banging sounds as if someone were tearing up the garage.

Culver heard screaming and yelling and ran to the garage to investigate.  When he arrived, he saw defendant standing over Matlock with an aluminum baseball bat.

---

[2] The facts found by the California Court of Appeal are entitled to deference from this Court absent a showing that they are unreasonable in light of the evidence of record (28 U.S.C. § 2254(d)(2); *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004); *see Sumner v. Mata*, 449 U.S. 539, 545-46 (1981)).  Petitioner has not argued nor made any showing that the facts as quoted herein are unreasonable.

Defendant struck Matlock 15 to 20 times with the bat as Matlock attempted to crawl away.  Defendant noticed Culver standing there and told him to leave.

As Freedle was starting up his car, defendant jumped in.  According to Freedle, defendant acted as if he had just robbed a bank.  He told Freedle he thought he had killed Matlock.  He explained that Matlock had come toward him with a bat and that defendant punched Matlock, took the bat out of his hands, and kept hitting him to keep him down "because nobody fucks with me, nobody."

Back at the motel, defendant told Renfro and Nakamura the same story he had told Freedle.  When they expressed disbelief that defendant continued to beat Matlock while he was on the ground, defendant changed his story, telling them that Matlock hit him with the bat first.  Defendant asked them to feel his head where Matlock had hit him, but no one saw marks or swelling on defendant's head.

The next day, defendant told Renfro he "needed to get out of here" and drove to Oregon.

Matlock sustained several skull fractures as a result of the attack.  Since the attack, he has become distrustful, suffers from memory deficits, and cannot remember anything that happened the night of the assault.

### *Defense*

Defendant took the stand in his own defense.  He testified that he stopped at Matlock's garage to retrieve $ 20 that Matlock had borrowed from him and Renfro.

When defendant entered the garage and asked Matlock for the money, Matlock became belligerent, yelled obscenities, and ordered defendant to leave.  Defendant refused to leave without the money.  Several more times, defendant demanded the money and Matlock told him to leave.  Finally, Matlock grabbed a baseball bat.  When defendant asked whether Matlock intended to hit him with the bat, Matlock struck him on the side of his head.  Defendant then punched Matlock in the jaw.  The two men wrestled on the couch, during which defendant was struck a second time with the bat.  Defendant wrested the bat from Matlock and told him if he came any closer, he would hit him with it.  When Matlock responded by reaching for a crowbar, defendant hit him on the side of the head with the bat and fled.

*People v. Lanning*, No. C050181, 2006 Cal. App. Unpub. LEXIS 5452, *2-5 (Cal. App. 3d Dist. June 20, 2006) (appended as App. B to the Pet.).

On June 30, 2005, petitioner was sentenced to a prison term of 11 years for the assault on Matlock (including sentencing enhancements based on a prior conviction and prison term).  Lodg. Doc. 1 at 229-30, 257-59, 261.  Petitioner's conviction was affirmed by the California

1  Court of Appeal on June 20, 2006.  Pet. at 46-59 (App. B).  The California Supreme Court

2  denied petitioner's petition for review on August 23, 2006, and petitioner filed the instant

3  petition for writ of habeas corpus in this court on December 22, 2006.  Lodg. Doc. 6; Pet. at 44

4  (App. A).  The action proceeds on the amended petition filed on January 3, 2008.  Dckt. No. 10.

5  **II.     Standard of Review**

6          Federal habeas corpus relief is not available for any claim decided on the merits in state

7  court proceedings unless the state court's adjudication of the claim:

8          (1) resulted in a decision that was contrary to, or involved an unreasonable
           application of, clearly established Federal law, as determined by the Supreme
9          Court of the United States; or

10         (2) resulted in a decision that was based on an unreasonable determination of the
           facts in light of the evidence presented in the State court proceeding.
11

12  28 U.S.C. § 2254(d).

13         Under § 2254(d)(1), a state court decision is "contrary to" clearly established U.S.

14  Supreme Court precedents "if it applies a rule that contradicts the governing law set forth in

15  [Supreme Court] cases, or if it confronts a set of facts that are materially indistinguishable from a

16  decision" of the Supreme Court and nevertheless arrives at a different result.  *Early v. Packer*,

17  537 U.S. 3, 8 (2002) (internal quotation marks omitted).

18         Under the  "unreasonable application" clause of § 2254(d)(1), a federal habeas court may

19  grant the writ if the state court identifies the correct governing legal principle from the Supreme

20  Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.

21  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A federal habeas court "may not issue the writ

22  simply because that court concludes in its independent judgment that the relevant state-court

23  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

24  application must also be unreasonable."  *Id.* at 411; *see also Lockyer v. Andrade*, 538 U.S. 63, 75

25  (2003).

26  ////

1    In determining whether the state courts have run afoul of § 2254(d), a federal court looks

2  to the last reasoned state court decision.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  The

3  state court is not required to cite the controlling Supreme Court precedent so long as its decision

4  is not "contrary to" or an "unreasonable application" of that precedent.  *Early*, 537 U.S. at 8.

5  **III.    Analysis**

6    Petitioner challenges his conviction on two grounds.  First, he contends that the trial

7  court deprived him of due process when it provided the jury with certain instructions regarding

8  the right of an occupant against a trespasser and the right of a person to use force in defense of

9  property.  Second, petitioner contends that he was further deprived of due process when the trial

10  court failed to provide additional instruction to the jury after the jury asked questions.

11  **A.    Petitioner Has Failed to Raise a Federal Claim Regarding the Jury
       Instructions**

13    The California Court of Appeal provided the last reasoned decision on petitioner's

14  claims.  The court summarized and ruled on petitioner's first claim as follows:

15    At the prosecutor's request and over the objections of defendant, the trial court
     instructed the jury with CALJIC Nos. 5.40, 5.42 and 5.43.

16    The jury was instructed in the language of CALJIC No. 5.40 as follows: "The
17   lawful owner or occupant of a residence or habitation on real property has the
     right to request a trespasser to leave the premises.  If the trespasser does not do so
18   within a reasonable time, the owner or occupant may use reasonable force to eject
     the trespasser. [P] The amount of force which may be used to eject the trespasser
19   is limited by what would appear to . . . a reasonable person, under the existing
     circumstances, to be necessary to prevent damage to the property or physical
20   injury or death to the owner, occupants or guests."

21    CALJIC No. 5.42, as stated to the jury, recited: "A person may defend his home
     or dwelling against anyone who manifestly intends or endeavors in a violent or
22   riotous manner to enter that home or dwelling and who appears to intend violence
     to any person in that home or dwelling. [P] The amount of force which the person
23   may use in resisting the trespass is limited by what would appear to a reasonable
     person in the same or similar circumstances necessary to resist the violent or
24   unlawful entry. [P] He is not bound to retreat even though a retreat might safely
     be made. He may resist force with force, increasing it in proportion to the
25   intruder's persistence and violence if the circumstances which are apparent . . . to
     the homeowner or lawful occupant of the property are such as would excite
26   similar fears and a similar belief in a reasonable person."

Finally, CALJIC No. 5.43 told the jury: "When conditions are present which, under the law, justify a person in using force in defense of property, that person may use that degree and extent of force as would appear to a reasonable person, placed in this same position, and seeing and knowing what the resisting person then sees and knows, to be reasonably necessary to prevent imminent injury threatened to the property. [P] Any use of force beyond that limit is excessive and unjustified, and anyone using excessive force is legally responsible for the consequences thereof."

The court followed this set of instructions with instructions on the law of self-defense (CALJIC No. 5.30), to which no one objected.

Defendant contends the trial court committed prejudicial error by giving the three quoted trespass instructions. He asserts that he was not a trespasser and, in any event, the instructions were inapposite because he was not the first one to use force.

"'The trial court functions both as a neutral arbiter between two contesting parties and as the jury's guide to the law. This role requires that the court fully instruct the jury on the law applicable to each particular case.'" (*People v. Daya* (1994) 29 Cal.App.4th 697, 712 (*Daya*).) The court must instruct the jury on general principles of law ""'closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."'" (*Ibid.*)

The challenged instructions were closely and openly connected to the facts of the case. Defendant testified that he attacked Matlock only after the latter approached him with a baseball bat. However, as the prosecutor pointed out in closing argument, as an occupant of the premises, Matlock had the right to request that a trespasser leave, and to use reasonable force to eject him if the request was refused. There was evidence, both from eyewitness accounts and from defendant himself, that Matlock repeatedly ordered defendant to leave and that each time defendant refused. The jury could decide that Matlock was justified in brandishing the bat as a reasonable method of ejecting defendant from the garage. Thus, even crediting defendant's testimony that Matlock first threatened him with the baseball bat, as between the lawful occupant (Matlock) and the trespasser (defendant), it was defendant who had a duty to retreat when confronted with the use of reasonable force. The instructions properly advised the jury that defendant's right to use force in self-defense was qualified by Matlock's initial right to eject him as a trespasser.

Defendant asserts that he could not have been a trespasser because he formerly lived in the Willett house and, as the boyfriend of the owner's granddaughter, he had "implied access to the property." The argument fails.

While it is true that defendant and Renfro temporarily stayed in Willett's house upon their arrival from Oregon, by the time the attack on Matlock took place they were residents of the Ben-Ber Hotel. Matlock, on the other hand, lived in his mother's house and occupied the garage during the summer. These facts distinguish this case from *People v. Corlett* (1944) 67 Cal.App.2d 33, relied on by defendant, where the court held that the victim was not a trespasser, but rather "an employee who may have been discharged, but who, after a request to secure his

6

personal belongings, was apparently proceeding to get them from the bunkhouse where he was accustomed to sleep[ing]" when he was shot by the defendant. (*Id.* at p. 50.) On this record, the jury could have concluded that defendant had no legal right to occupy the premises where the assault took place.

Defendant's claim that the trespass instructions did not apply because there was no evidence he threatened to hurt Matlock or damaged his property before Matlock became aggressive, also lacks merit. CALJIC No. 5.42 permits an occupant to "defend his home or dwelling against anyone who manifestly intends or endeavors in a violent or riotous manner, to enter that home or dwelling and who appears to intend violence to any person in that home or dwelling." CALJIC No. 5.40 gives an occupant of a residence the right to use reasonable force against a trespasser to prevent property damage or injury to persons therein. Freedle testified that after Matlock screamed at defendant to get off his property, there were sounds like "shop equipment getting dumped and loud banging . . . like somebody was . . . tearing the hell out of that garage." The jury could thus infer that defendant engaged in the type of conduct that would confer upon Matlock the right to use reasonable force to defend his dwelling.

Defendant's claim of instructional error is without merit.

*Lanning*, 2006 Cal. App. Unpub. LEXIS 5452 at *5-11.

Petitioner raises the same state-law arguments here that were rejected by the Court of Appeal. He contends that the instructions were inapplicable to his case because: (1) the victim rather than the defendant exercised his right to self-defense in this case; (2) petitioner was not a trespasser as a matter of state law; and (3) there was no evidence that petitioner used force or threatened to use force or commit a crime. These claims of error in the application of California law are not cognizable in a federal habeas petition, however, which lies only to correct deprivations of federal rights. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

In an attempt to reframe the issue as a federal one, petitioner argues that these state-law errors deprived him of his right to due process under the federal Constitution because they somehow shifted the burden of proof to petitioner to prove that he acted in self-defense and was not a trespasser. While it is clearly-established federal law that "[t]he government must prove beyond a reasonable doubt every element of a charged offense," *Victor v. Nebraska*, 511 U.S. 1,

5 (1994), the court is unconvinced that the alleged errors of state law complained of by petitioner

lightened the prosecutor's burden in this case or improperly shifted a burden of proof to

petitioner.  In any criminal case, the prosecutor presents evidence to establish that the offense

has been committed, and the defendant has the option to rebut that evidence in whatever way to

demonstrate to the factfinder that the prosecutor's evidence fails to establish the elements of the

offense beyond a reasonable doubt.  Here, the prosecutor presented evidence that petitioner was

trespassing and therefore his legal right to use force against the victim were limited, and the jury

was accordingly provided with instructions informing it how to address that evidence under

California law.  Such facts do not show an impermissible shifting of the burden of proof from the

prosecution to petitioner.  Petitioner has failed to establish that the challenged jury instructions

deprived him of a federal right.

### B.    Petitioner's Claim of Inadequate Response to Jury Questions Is Procedurally Defaulted

On petitioner's second claim, the Court of Appeal stated:

After the jurors retired for deliberations, they sent the court a note with the following four questions: "1. Does being asked to leave and not leaving legally make you a trespasser? [P] 2. Does a trespasser have a legal right to self-defense? [P] 3. Is there a legal way to determine which takes precedence (trespasser or self-defense)? [P] 4. Legal definition of unlawful entry."

The court and counsel discussed how to respond to the questions at some length, after which the following colloquy occurred:

"[THE COURT:] And I think it's fair to say that both attorneys and I have spent some time trying to determine how to answer these questions, and at least in the short period of time that we have had to discuss it and not had an opportunity to see if there is additional law that could answer these questions that is on the book, law in the form of either other CALJIC instructions or case law or statutory law.

"And I think that what I am proposing that we do at this point, and I think that counsel are fairly in agreement with this, is that we need to tell the jury that we do not have any additional legal instructions of law that we can give them that would answer these questions, and the best that we can do today is to continue to refer them to the instructions that they've already been given and to apply their common sense and their ordinary meanings of words to those instructions, and ask them to, if they think that they can, go back and continue their deliberations on that basis because I don't think we can do any better than that.

"So that is what I'm proposing that we do, counsel.

"[PROSECUTOR]: Submitted, your Honor.

"[DEFENSE COUNSEL]: Yeah. That's what you're going to do?

"THE COURT: Well--

"[DEFENSE COUNSEL]: That's what we said. So, that's fine.

"THE COURT:  I would certainly be open to any other courses of action that you would – that you would request at this point."

Defense counsel replied that "they have to deal with the instructions as they are, and if we leave it at that, then I don't have a problem with it."  He went on to state that "if we're starting to say that we can't come up with any legal authority or do anything in respect to trying to answer their questions and everything, just seems to me that we haven't really been given an opportunity to do that, if we were going to do that. [P] *And if it's something that is critical to their decision, then perhaps maybe – maybe we should be given an opportunity to do so, and I'm not going to be in a position to do it today*, something for Monday."[3] (Italics added.)

> [3] As the prosecutor noted, this discussion took place at 5:00 p.m. on a Friday.

The trial court then reconvened the jury and told them that in the short period of time in which the court and the attorneys had to discuss the matter, they could not come up with "any further definitions or further legal statements that would answer these questions. [P] And what happens a lot of times is that we try to provide to you in the form of the jury instructions the statements of law that apply, and then there comes a point where you have to apply as citizens, essentially, your common sense, understanding of terms and words and go from there."  The court told the jurors, "we haven't really had that much time to spend, but if, in fact, there are some additional legal principles that could be applied to this case, it would in all likelihood take a lot of time and research to determine that."  Therefore, "if you feel that it's critical for you to reach the correct decision in your deliberations that you have additional legal terminology and that it's worth our spending some legal research time to do that, then we can do that, spend that time, and, you know, no promises that there is something out there that would be helpful, but we can spend that time."  The judge then exhorted the jury to "apply your common sense, wisdom, and your understanding and knowledge of the English language and what words mean and go from there."

In response to the court's inquiry, the foreperson indicated the jury's preference to return to deliberations.  "I don't think we're going to stay very late. [P] . . . [P] We're just in the middle of something that we wish to finish."  Sixty-five minutes after retiring, the jury returned with a verdict.

***

1    Defendant claims the trial court committed prejudicial error in failing to provide
     the jury with supplemental instructions in response to their questions. This claim
2    is nonreviewable under the twin doctrines of waiver and invited error.

3    Section 1138 provides, in part: "After the jur[ors] have retired for deliberation, if
     there be any disagreement between them as to the testimony . . ., they must
4    require the officer to conduct them into court.  Upon being brought into court, the
     information required must be given in the presence of, or after notice to, the
5    prosecuting attorney, and the defendant or his counsel, or after they have been
     called."

6
     It is a well-established principle that when a defendant approves of the trial
7    court's response to a jury question during deliberations, any claim of error with
     respect to that response is waived.  (*People v. Bohana* (2000) 84 Cal.App.4th 360,
8    373.)  Furthermore, where trial counsel fails to object to the court's response to a
     jury question, the failure to object may be construed as approval of that response.
9    (*People v. Boyette* (2002) 29 Cal.4th 381, 430; *People v. Price* (1991) 1 Cal.4th
     324, 414; *People v. Kageler* (1973) 32 Cal.App.3d 738, 746, 108 Cal. Rptr. 235.)
10
     As the quoted excerpts show, defense counsel approved of telling the jurors to
11   "deal with the instructions as they are," but asserted that if any issue became
     critical to their deliberations, the court and counsel should be given more time to
12   research and come up with further responses.  The trial court's response
     conformed exactly to counsel's proposal.  The judge told the jurors to re-read the
13   instructions given, but "if you feel that it's critical for you to reach the correct
     decision in your deliberations that you have additional legal terminology and that
14   it's worth our spending some legal research time to do that, then we can do that."
     The foreperson indicated that the jury wished to continue deliberating without
15   further elaboration, and they were allowed to do so.

16   The invited error doctrine is "'designed to prevent an accused from gaining a
     reversal on appeal because of an error made by the trial court at his behest.  If
17   defense counsel intentionally caused the trial court to err, the [defendant] cannot
     be heard to complain on appeal.'"  (*Daya, supra*, 29 Cal.App.4th at p. 720.)  We
18   will not countenance a claim that the trial court's response to the jury's questions
     was inadequate where defendant not only failed to object, but was the chief
19   architect of that response.

20   *Lanning*, 2006 Cal. App. Unpub. LEXIS 5452 at *11-17.

21        Under the procedural default rule, federal courts must generally decline to review federal

22   claims where the state court decision under review rejected the claims based on a state

23   procedural rule that was independent of the federal issues and adequate to support the judgment.

24   *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Bennett v.*

25   *Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).  Where the state court's rejection of a claim was

26   based on an adequate and independent state procedural rule, a petitioner may obtain federal

                                           10

1   review only by demonstrating either (1) cause for the procedural default and prejudice or (2) that

2   the failure to review the claims will result in a fundamental miscarriage of justice. *Coleman*, 501

3   U.S. at 750.

4          The Ninth Circuit has found that California's rule that an issue not objected to at the time

5   it arose is nonreviewable on appeal (the "contemporaneous objection" rule) and the invited error

6   doctrine may be grounds for procedural default. *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th

7   Cir. 2004) (petitioner's claim that trial court failed to adequately respond to a jury question was

8   procedurally barred because trial counsel did not contemporaneously object and petitioner failed

9   to show that the contemporaneous objection rule was unclear, inconsistently applied or not well-

10  established); *Leavitt v. Arave*, 383 F.3d 809, 832-33 (9th Cir. 2004) (invited error doctrine must

11  be relied on by state court to be basis for procedural default).  To determine in this case whether

12  petitioner's claims are procedurally defaulted based on those state procedural rules, the court

13  must follow the burden-shifting framework established in *Bennett*.  Under the *Bennett*

14  framework, the state bears the initial burden of pleading the existence of an adequate state

15  procedural ground as an affirmative defense.  *Id.* at 586.  Once the state does so, the burden

16  shifts to the petitioner to assert "specific factual allegations that demonstrate the inadequacy of

17  the state procedure, including citation to authority demonstrating inconsistent application of the

18  rule."  *Id.*  If the petitioner does so, the burden then shifts back to the state to ultimately prove

19  that the state procedural rule is nevertheless adequate.  *Id.*

20         In this case, the state has pleaded as an affirmative defense and argued that the

21  contemporaneous objection and invited error bars are independent and adequate.  Resp.'s

22  Answer at 10, 25-28.  Petitioner was thus required to make some showing that those procedural

23  bars are inadequate.  He has not done so, having filed no reply to respondent's answer and

24  supporting memorandum.  Nor has petitioner made any showing of cause for the procedural

25  default.  Accordingly, the court concludes that petitioner's claim that the trial court deprived him

26  of due process by inadequately responding to the jury's questions has been procedurally

1  defaulted.

2  **IV.    Order**

3          Because petitioner has failed to show that the Court of Appeal's denial of his claim of

4  instructional error was contrary to, or an unreasonable application of, clearly-established federal

5  law, and because petitioner's remaining claim of inadequate response to jury questions has been

6  procedurally defaulted, it is hereby ORDERED that:

7          1.  Petitioner's application for a writ of habeas corpus is denied;

8          2.  The Clerk is directed to close the case; and

9          3.  The court declines to issue a certificate of appealability.

10  Dated:  July 25, 2011.

11

12                                          EDMUND F. BRENNAN
                                            UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26